

# Missouri Court of Appeals

## Southern District

### Division One

THE EXECUTIVE BOARD
OF THE MISSOURI BAPTIST CONVENTION,

    Plaintiff/Appellant,

    vs.

WINDERMERE BAPTIST CONFERENCE
CENTER, INC., JAMES L. HILL, RELIANCE
TRUST COMPANY, NATIONAL CITY BANK
OF THE MIDWEST, CONSOLIDATED
MORTGAGE, INC., and FIRST AMERICAN
TITLE MISSOURI AGENCY, INC.,

    Defendants/Respondents.[1]

No. SD32699 and SD32735
Consolidated
Filed: March 25, 2014

APPEAL FROM THE CIRCUIT COURT OF CAMDEN COUNTY

Honorable Ralph Jaynes, Senior Judge

**<u>AFFIRMED</u>**

This is an appeal by The Executive Board of the Missouri Baptist Convention ("The

Executive Board"), from the trial court's entry of judgments against The Executive Board in

favor of Respondents Windermere Baptist Conference Center, Inc. ("WBCC"), James L. Hill

---

[1] This lawsuit, as captioned above, filed in Camden County, was originally styled "Larry Atkins, et al. v. William Jester, et al." However, during the course of this lawsuit, spanning seven years, various amendments to the original petition have taken place removing or replacing party plaintiffs. In addition, numerous other defendants have been parties to this lawsuit, and as best we can discern from the record, these defendants were all disposed of or dismissed at various times leaving only those defendants/respondents listed in the caption above as parties to this appeal.

("Hill"); Reliance Trust Company ("RTC"); and National City Bank of the Midwest, Consolidated Mortgage, Inc., and First American Title Missouri Agency, Inc., (collectively the "NCB defendants"). We affirm the judgments of the trial court.

**Overview**

An overview of this case is necessary and an exercise in complexity due to the long history of this dispute. The history and record of this case is that this is now the fourth time this matter has been presented in some way to an appellate court. In addition, the current matter before this Court includes The Executive Board's brief containing 18 points and more than 4,000 pages of legal file, including numerous motions for summary judgment. The nature of the issues, the multiple parties, and the wrangling among the parties, made it difficult for this Court to engage in all issues asserted. The "disingenuous" position of The Executive Board, along with their "convoluted and fastidious" distinctions, have made this appeal even more challenging, not to mention the burdens placed upon the trial court. *The Executive Bd. of the Missouri Baptist Convention v. Windermere Baptist Conference Center*, 280 S.W.3d 678, 687, 689 (Mo.App. W.D. 2009).

In order to fully explain our decision, it is necessary to address the Byzantine journey this case has made through our courts. The three previous opinions are: *The Executive Bd. of Missouri Baptist Convention v. Carnahan*, 170 S.W.3d 437 (Mo.App. W.D. 2005) (*Windermere I*); *The Executive Bd. v. Windermere*, 280 S.W.3d at 678 (*Windermere II*); and *Atkins v. Jester*, 309 S.W.3d 418 (Mo.App. S.D. 2010) (*Windermere III*). We borrow freely from the facts and opinions contained in *Windermere I*, *II* and *III*, only for purposes of this overview and to establish clear context, without further attribution. *Windermere I* and *II* were lawsuits filed in Cole County by The Executive Board in which the Western District ultimately

2

affirmed the circuit court's dismissal of claims and a grant of summary judgment in favor of WBCC. The case out of which this appeal arises was filed in Camden County prior to the Western District's opinion in *Windermere II*. In *Windermere III*, this Court dismissed that appeal because the judgment was not final. 309 S.W.3d at 422. The matter was remanded, and after the trial court below granted motions for summary judgment in favor of Respondents, this matter is now before this Court once again.

## Facts and Procedural History

In light of the extensive nature of this case, and because this case is the culmination of two separate lawsuits, an exhaustive explanation of the factual and procedural history is necessary in understanding the claims now before this Court, and our ultimate holding, in order to clearly understand the context of this case. In reviewing the facts, we have utilized the statements of uncontroverted facts in the record, as well as *Windermere I*, *II* and *III*.

The Executive Board is a Missouri non-profit corporation which purports to act on behalf of the Missouri Baptist Convention ("MBC"),[2] an unincorporated association of representatives (known as "messengers") from affiliated Southern Baptist churches in the state of Missouri. Prior to 2001, The Executive Board was the titled owner of a conference and recreational facility located on 1,300 acres ("the Property"), which was known as the "Windermere Baptist Conference Center," and located in Camden County. "[The Property] was titled in the name of [T]he Executive Board of [MBC]." *Windermere II*, 280 S.W.3d at 684. This Property, and its ownership, is the heart of this lawsuit. The record reflects The Executive Board is attempting to reclaim the Property, and has been trying to do so since *Windermere I*.

---

[2] The Executive Board's ability to act on behalf of MBC is not an issue in this appeal.

In 1999, MBC and The Executive Board planned to organize some of its ministries and assets into "subsidiary non-profit corporations." The Executive Board asserted the intent was for oversight and direction of the subsidiary non-profit corporations to remain with The Executive Board and MBC. The plan to organize the ministries and assets was titled the "New Directions Plan." The Property was part of the New Directions Plan.

At its October 1999 annual meeting, the recommendations in the New Directions Plan were adopted, and MBC messengers voted to authorize the creation of a new Missouri non-profit corporation, WBCC, "to take over the assets and operations of [the Property]." *Windermere II*, 280 S.W.3d at 684. On July 11, 2000, The Executive Board authorized Hill, the then-Executive Director of The Executive Board,[3] to proceed with the necessary steps to implement the incorporation of WBCC and the Property, including working with The Executive Board's legal counsel, Mark Comley ("Comley"). Thereafter, Hill worked with Comley to prepare and file the articles of incorporation to create WBCC, a Missouri non-profit corporation. "The stated purpose for [WBCC] was to establish and maintain conference and recreational facilities to facilitate Christian renewal and commitment." *Windermere III*, 309 S.W.3d at 421.

In drafting the articles of incorporation for WBCC, Comley advised Hill that a clause requiring MBC approval of charter amendments (referred to as an "approval clause") in the WBCC articles of incorporation was not mandatory for purposes of incorporation.[4] Comley advised Hill by letter that Missouri law did not require an approval clause, stating: "Article 12 [(approval clause)] is not a mandatory article for purposes of incorporating the Conference

---

[3] Hill admitted in his pleadings that he was "the Executive Director-Treasurer of MBC and [T]he Executive Board."

[4] An approval clause was originally contained in the WBCC articles of incorporation as Article 12.

4

Center.  It is strictly optional."[5]  The WBCC articles of incorporation were filed by Comley on August 25, 2000.  The WBCC articles did contain a provision requiring MBC election of certain trustees; however, it did not contain an approval clause requiring MBC approval of WBCC charter amendments.

At MBC's annual meeting on October 31, 2000, The Executive Board presented its "Recommendation No. 3" (the "Recommendation") for MBC to ratify WBCC's August 25, 2000 articles of incorporation, which did not contain an approval clause, and authorize the transfer of assets and liabilities from The Executive Board to WBCC, effective January 1, 2001.

The official record of the October 31, 2000 annual meeting indicates 3,074 messengers were in attendance when MBC voted on the Recommendation.  The WBCC articles of incorporation were printed in the October 31, 2000 "*Tuesday* **Bulletin** [sic]"[6] for the "MBC Annual Meeting," and messengers were provided an opportunity to express their opinions about the Recommendation.  *See **Windermere II**, 280 S.W.3d at 280.  At the meeting, the messengers discussed concerns that if the WBCC articles of incorporation were ratified, the WBCC board might be able to "break away" from MBC like another affiliated agency had done the previous month.  There is no record of Hill making any representations to MBC regarding the Recommendation.  Thereafter, MBC messengers voted in favor of the Recommendation,

---

[5] While Comley noted an approval clause was not mandatory, he pointed out that the approval clause "[a]s written" before incorporation, did not require written approval of The Executive Board and MBC for amendments to the articles.  He suggested that if the approval clause was included, it should be modified to make amendments subject to the approval *in writing* of MBC upon recommendation of The Executive Board.

[6] This publication is also referred to in the record as the "*Daily Bulletin*."  However, a copy of the publication contained in the record indicates the correct name is the "*Tuesday* **Bulletin** [sic]."

ratifying WBCC's articles of incorporation and authorizing the transfer of the Property and the liabilities to WBCC.[7]

MBC messengers also voted to select WBCC's six initial trustees. The WBCC articles of incorporation provided for nine trustees, and that three of the trustees "shall be permanent members by virtue of office." The three *ex officio* trustees were to be the MBC Executive Director—then Hill; the MBC president—then Robert D. Collins ("Collins"); and the "Chairman of the Windermere Board of Advisors."

On November 16, 2000, MBC, through The Executive Board, filed an application with the Internal Revenue Service for IRC 501(c)(3) exempt status for WBCC. In the letter attached to the application for exempt status, it was noted that WBCC "'functions as a separate corporation with a separate governing body and is not managed or controlled by [MBC].'" *Windermere II*, 280 S.W.3d at 685. Between December 2000 and April 2001, The Executive Board conveyed the Property to WBCC by deed, in compliance with MBC's approval of the Recommendation.

Then, on July 30, 2001, the WBCC board of trustees adopted amended articles of incorporation, without seeking the permission or approval of MBC or The Executive Board before amending the articles of incorporation. The amended articles no longer granted MBC the privilege of nominating and selecting WBCC's trustees, and in the event of dissolution, no longer required the distribution of corporate assets to MBC's affiliated organizations. With the amendment to the articles, WBCC became a self-perpetuating entity.

---

[7] At all relevant times, the Bylaws of MBC stated in pertinent part that "[t]he adoption by the Convention . . . of any motion or recommendation, as amended, shall be regarded as an expression of the Convention's will and therefore binding on any party or parties specified or implied therein until further action by the Convention." At all relevant times, the articles of incorporation for The Executive Board stated in pertinent part that "the Board shall not have power to reverse any action of the Convention[.]"

6

Hill abstained from the WBCC vote to adopt the amended articles of incorporation. In August 2001, The Executive Board knew that Hill supported WBCC's decision to amend its articles, and that Hill had abstained from voting on the amendment because he felt his responsibilities as MBC's executive director did not allow him to vote on the action.

Even though he was a member of the WBCC board of trustees, Collins did not attend the July 30, 2001 board meeting, nor did he attend any of the six preceding monthly board meetings. When the WBCC board of trustees was considering amending its articles to become self-perpetuating, written information about the changes to the articles was sent to all trustees, including Collins.

The Executive Board admitted in its response to Hill's statement of uncontroverted facts that Collins learned "within probably a few days, if not a week" of the July 30, 2001 board meeting, that the WBCC board of trustees had voted to amend its articles of incorporation and become self-perpetuating. The Executive Board believed that when the incorporation of WBCC and transfer of assets was approved in 2000, Hill represented that WBCC would "remain under the jurisdiction of [MBC]" through the process of electing trustees. When Collins learned that WBCC adopted amended articles within a few days or a week after the vote, he believed Hill had broken his promise that "there would not be changes in terms of how these agencies related to [MBC]."[8]

On August 9, 2001, the then-official newspaper of MBC, the *Word & Way*, published an article with the headline: "Windermere: Selfperpetuating board." This article reported that WBCC's board of trustees had adopted amended articles of incorporation and that "[a]ttempts to reach Collins for comment were unsuccessful."

---

[8] The record does not contain any admissible evidence of this belief or any evidence of a "broken promise" by Hill.

In the fall of 2001, Hill met with Collins and MBC Vice President Bob Curtis ("Curtis"), to inform them of his desire to resign, his reasons for doing so, and the terms of a proposed severance package and release. At the end of September, a joint meeting was held with Collins, Curtis, Hill, and two other officers of The Executive Board to prepare a severance agreement and release.

At a special meeting held on October 4, 2001, The Executive Board considered a recommended severance package to Hill, and whether to authorize execution of a "Cooperation Agreement and Release" ("Release") with Hill. The Release was prepared by the Comley law firm, and purported to discharge Hill from liability for all claims known and unknown arising out of his employment with The Executive Board. In a letter dated October 3, 2001, the Comley law firm informed Collins that by executing the Release, both The Executive Board and Hill "will release all existing claims against one another for the consideration included in the agreement."

During the October 4, 2001 meeting, prior to debate on the Release, Hill told The Executive Board that he was resigning because of the "growing division" within The Executive Board in 2001, because "some board members do not have confidence in my leadership," because some individuals want to file litigation against the breakaway agencies and "do not trust me," and because he no longer had the trust required to lead as executive director: "Some who do not trust me will not allow me to lead and others will not follow my leadership."

The motion to authorize execution of the Release was debated and carried with opposition. Collins, on behalf of The Executive Board, executed the Release on October 4, 2001; Hill's resignation was effective October 19, 2001. Included within the terms of the Release was a recitation of money paid to Hill, along with other consideration for the Release;

mutual release language whereby each party was releasing the other ("mutual release"); and the following paragraph:

> 10. The parties declare and represent that no promise, inducement or other agreement not expressly contained herein has been made; that this release contains the entire agreement between the parties; and that the terms of this release are contractual and not a mere recital.

### The Cole County Lawsuit

On August 13, 2002, The Executive Board filed its first lawsuit in Cole County against WBCC, asserting various legal theories in an attempt to invalidate the amended articles of incorporation and thereby allow it to ultimately re-acquire the Property and assets.

On March 11, 2004, the Cole County lawsuit was dismissed, after which an appeal was filed and the case was remanded. *Windermere I*, 170 S.W.3d at 453. On remand, the court dismissed The Executive Board's conspiracy claims against WBCC and granted summary judgment in favor of WBCC on The Executive Board's remaining claims. The Western District affirmed the judgment on February 3, 2009. *Windermere II*, 280 S.W.3d at 699.

### The Camden County Lawsuit

The current appeal arises from the Camden County lawsuit. Before the Western District issued its opinion in *Windermere II*, The Executive Board filed a lawsuit in Camden County *on November 1, 2006.*[9] In the Camden County lawsuit, The Executive Board "tried a different track, filing a[n alleged] quiet title claim in Camden County, the county in which [the Property] is located." *Windermere III*, 309 S.W.3d at 421. Unlike the Cole County lawsuit, the defendants in the Camden County lawsuit consisted of Hill, RTC, and the NCB defendants, along with WBCC, that was previously named in the Cole County lawsuit. RTC and the NCB

---

[9] A First Amended Petition was filed on November 16, 2006. A copy of the Cole County petition, along with a preliminary injunction entered in the Cole County lawsuit, was attached to the First Amended Petition filed in the Camden County lawsuit.

defendants asserted a financial interest in the Property, the specifics of which are unclear from the record. The Executive Board's pleadings allege these Respondents "may claim an adverse interest in the . . . Property."

A Second Amended Petition was filed, and on April 9, 2009, the court granted WBCC's motion to dismiss all claims against it in the Second Amended Petition. The Executive Board and MBC appealed and this Court dismissed the appeal because the April 9, 2009 judgment was not a final judgment for purposes of appeal. ***Windermere III***, 309 S.W.3d at 422.

After remand to the Circuit Court of Camden County, The Executive Board and MBC filed their "Fourth Amended and Restated Petition" ("Fourth Amended Petition") on June 21, 2010, which is the pleading now at issue before this Court. The Fourth Amended Petition alleged RTC and the NCB defendants "assert[ed] a right or interest in the . . . Property."

The Fourth Amended Petition contained numerous allegations to the effect that Hill made fraudulent misrepresentations and/or omissions to The Executive Board and MBC. Count I alleged a claim for fraudulent misrepresentation against Hill; Count II sought damages for breach of fiduciary duties against Hill; and Count III sought "Quiet Title and Rescission" against WBCC, RTC, and the NCB defendants on the basis of Hill's alleged fraud.

Four separate motions for summary judgment were eventually filed. On July 5, 2011, Hill filed a motion for summary judgment and statement of material uncontroverted facts pursuant to Rule 74.04,[10] alleging the claims against Hill in Count I (fraudulent misrepresentation) and Count II (breach of fiduciary duty), were "barred by three affirmative defenses: statute of limitations, release, and collateral estoppel/res judicata." Hill further alleged there was "no genuine dispute as to the existence of each of the facts necessary to support these

---

[10] All rule references are to Missouri Court Rules (2013), and all references to statutes are to RSMo 2000, unless otherwise indicated.

defenses."  As to Count III ("Quiet Title and Rescission"), Hill alleged he was entitled to summary judgment because "plaintiff could not establish, after an adequate period of discovery, any interest in the Property, which is an essential element of a quiet title action."[11]

WBCC's motion for summary judgment alleged it was entitled to summary judgment because:  (1) the claim for rescission against WBCC is barred by the doctrines of *res judicata* and collateral estoppel; (2) The Executive Board failed to state a claim against WBCC; (3) rescission relief is barred in whole or in part because The Executive Board's claims were barred by full performance of the contracts, and rescission is not an available remedy; (4) the statute of limitations barred The Executive Board's claims; (5) WBCC's claim to title to the Property is superior to claim of The Executive Board and MBC; and (6) The Executive Board failed to establish fraud by Hill.

The basis for the NCB defendants' motions for summary judgment included: (1) collateral estoppel/*res judicata*; (2) failure of The Executive Board to establish a claim to quiet title; (3) failure of The Executive Board to establish a claim for rescission; (4) failure to name the NCB defendants in The Executive Board's Count I; (5) the Release of Hill; (6) statute of limitations; and (7) The Executive Board's claims for quiet title are barred against all defendants if the claim for quiet title is barred as against any defendant.

RTC filed its motion for summary judgment alleging it was entitled to summary judgment for two reasons:  (1) the doctrine of issue preclusion prevented The Executive Board from relitigating claims already decided in earlier litigation; and (2) because the 5-year statute of limitations barred The Executive Board's claims.

---

[11] The Executive Board's response to Hill's statement of uncontroverted facts to this effect was that "[The Executive Board] is filing a Voluntary Dismissal of [Hill] as to Count III, so this item is moot."

11

As a part of Respondents' motions for summary judgment, The Executive Board filed responses to the statements of material uncontroverted facts, as well as its additional material facts alleged to be in dispute. Many of The Executive Board's responses and additional material facts were supported by and relied upon the "Affidavit of Robert D. Collins" (the "Collins Affidavit"). However, the Collins Affidavit was stricken by the trial court in response to Hill's motion to strike. The Executive Board has not challenged the trial court's ruling as to the Collins Affidavit.

On March 19, 2013, the trial court conducted a hearing on the various motions for summary judgment. The trial court granted Hill's motion for summary judgment finding the claims against Hill "are barred by the Statute of Limitations (§ 516.120(5) RSMo.) and by virtue of a valid Release executed by [The Executive Board] on or about October 4, 2011." WBCC's motion for summary judgment was granted "for the reasons stated in WBCC's Motion for Summary Judgment, its Legal Memoranda in Support, and its Statements of Uncontroverted Material Facts, as well as for the reasons orally argued to the Court[.]" RTC's motion for summary judgment was also granted; however, an "Amended Judgment" notes it was granted on the "basis of issue preclusion, also known as collateral estoppel." The trial court also noted it granted summary judgment in favor of WBCC, which in effect terminated all claims of right, title, and interest of The Executive Board to the Property causing The Executive Board to no longer have standing to pursue claims against RTC. Finally, the trial court granted the NCB defendants' motion for summary judgment "for the reasons stated in [the NCB] [d]efendants' legal memorandum and supplemental legal memorandum, . . . as well as those reasons orally argued before the [c]ourt[.]" This appeal followed.

12

**The Executive Board's Rule Violations**

Our examination of this appeal must begin with not only the various motions to dismiss asserted by Hill, RTC, and WBCC for The Executive Board's violations of Rule 84.04(c), but also The Executive Board's failure to recognize its violations of Rule 74.04 in its statement of facts. Because of the rule violations, it is unnecessary for us to reach the eighteen points asserted on behalf of The Executive Board.

Respondents argue that The Executive Board's brief fails to comply with the requirements of Rule 84.04(c) for a proper statement of facts, and Rule 84.04(e) for a proper argument.[12] We agree that The Executive Board failed to comply with Rule 84.04. To understand our decision, it is critical to understand our standard of review.

**Standard of Review**

Our review in a case involving the granting of a summary judgment is *de novo*, and we view the record in the light most favorable to the party against whom judgment was entered. *ITT Commercial Finance Corp. v. Mid-America Marine Supply Corp.*, 854 S.W.2d 371, 376 (Mo. banc 1993); *American Std. Ins. Co. v. Hargrave*, 34 S.W.3d 88, 89 (Mo. banc 2000). When the moving party is the defendant, as in this case, summary judgment can be established by showing one of the following:

> (1) facts that negate *any one* of the claimant's elements facts, (2) that the non-movant, after an adequate period of discovery, has not been able to produce, and will not be able to produce, evidence sufficient to allow the trier of fact to find the existence of *any one* of the claimant's elements, or (3) that there is no genuine dispute as to the existence of *each* of the facts necessary to support the movant's properly-pleaded affirmative defense.

---

[12] Hill's motion to dismiss includes a claim that The Executive Board's brief, "in its statement of facts and argument, includes improper facts and omits admitted material facts in violation of Rule 84.04(c) and (e)." Rule 84.04(c) details the requirements of a statement of facts, while (e) addresses the argument section of a party's brief. Because Hill's complaint with respect to 84.04(e) relates back to the "facts" included in the argument, we combine our response to Hill's Rule 84.04 rule violation complaint.

***ITT Commercial Fin.***, 854 S.W.2d at 381 (emphasis in original).

Once the movant has made "a prima facie showing that there are no genuine issues of material fact and that movant is entitled to judgment as a matter of law," the burden shifts to the non-movant to show that one or more of the material facts shown by movant not to be in dispute, is actually genuinely disputed. ***Id.*** "The non-movant may not rest upon the allegations and denials of the pleadings, but rather must use affidavits, depositions, answers to interrogatories, or admissions on file to show the existence of a genuine issue for trial." ***Crow v. Crawford & Co.***, 259 S.W.3d 104, 113 (Mo.App. E.D. 2008). "A genuine dispute is one that is real, not merely argumentative, frivolous, or imaginary." ***Id.***

### Rule 74.04 Violations

Rule 74.04 governs motions for summary judgment, and the requirements of Rule 74.04 are mandatory. ***Wichita Falls Prod. Credit Ass'n v. Dismang***, 78 S.W.3d 812, 814 (Mo.App. S.D. 2002). "[F]ailure to respond to the factual allegations in a defendant's motion for summary judgment is an admission of those facts." ***Birdsong v. Christians***, 6 S.W.3d 218, 223 (Mo.App. 1999). Here, The Executive Board's responses to Respondents' statement of uncontroverted material facts did not comply with Rule 74.04(c)(2), which requires that a response to a motion for summary judgment: (1) "admit or deny each of movant's factual statements"; (2) "set forth additional material facts that remain in dispute"; and (3) "support each denial [and factual statement asserted in response] with specific references to the discovery, exhibits, or affidavits." Rule 74.04(c)(2); *see* ***Wichita Falls Prod. Credit Ass'n***, 78 S.W.3d at 815. Specifically, The Executive Board failed to just admit or deny each of Respondents' numbered statements of fact. Instead, The Executive Board's responses also "STATE[D]" additional facts beyond those in the paragraph, and denied facts not included in the paragraphs.

14

Factual allegations in a motion for summary judgment which are not properly denied in accordance with Rule 74.04(c)(2) are deemed admitted. *Id.* (noting "[t]his Court is not required to compare each averment in Appellants' suggestions to each averment in Respondent's . . . . motion for summary judgment in order to ascertain which factual statements were admitted or denied."). The Executive Board's responses to Respondents' statement of uncontroverted material facts fall woefully short of the requirements of Rule 74.04(c)(1) & (2).

The Executive Board completely disregarded the requirements of Rule 74.04, and this Court's *de novo* review standard. We remind The Executive Board that while the trial court sits as one judge reviewing the motions, evidence, and applicable law, our review is *de novo*; the only difference in the function of the trial court and this Court in evaluating motions pursuant to Rule 74.04, is that this Court sits as three judges reviewing the motions, evidence, and applicable law (unless the Court sits en banc).

### Rule 84.04 Violations

However, this was not the only procedural violation committed by The Executive Board. Rule 84.04(c) requires The Executive Board's brief to contain a "fair and concise statement of the facts relevant to the questions presented for determination without argument." Rule 84.04(c). Since the trial court adjudicated this case by summary judgment, the facts on which the trial court based its decision were those established pursuant to Rule 74.04(c)(1) & (2). *Chopin v. Am. Auto. Ass'n of Missouri*, 969 S.W.2d 248, 251 (Mo.App. S.D. 1998). As a result, "the statement of facts in [The Executive Board's] brief should have set forth the material facts established by Rule 74.04(c)(1) and (2), together with the pages in the legal file where such facts are established." *Id.* We must scrutinize those facts, and as a consequence, when we do so here, The Executive Board's statement of facts in its brief also falls woefully short of setting forth the

15

material facts established by Rule 74.04(c)(1) & (2), along with the pages in the legal file where such facts are established. *Id.*

> An appellant has the duty to define the scope of the controversy by stating the relevant facts fairly and concisely. *Haynes Family Corp. v. Dean Properties, Inc.*, 923 S.W.2d 465, 466[2] (Mo.App. S.D.1996); *Amparan v. Martinez*, 862 S.W.2d 497, 498 (Mo.App. E.D.1993). The purpose of the statement of facts is to afford an immediate, accurate, complete and unbiased understanding of the facts of the case. *Haynes Family Corp.*, 923 S.W.2d at 466–67[3]; *Amparan*, 862 S.W.2d at 498. A statement of facts containing practically no facts relating to any issue raised on appeal does not comply with Rule 84.04(c). *Haynes Family Corp.*, 923 S.W.2d at 467[5]; *Mease v. McGuire*, 886 S.W.2d 654, 655[2] (Mo.App. S.D.1994).

*Chopin*, 969 S.W.2d at 251.

A statement of facts that does not identify: (1) the material facts established by a party's motion for summary judgment and the party opposing the motion for summary judgment's response, or (2) the material facts, if any, pled in the motion for summary judgment properly denied by the opposing party's response, violates Rule 84.04(c). *Id.* "Violations of Rule 84.04(c) constitute grounds for dismissal of an appeal." *Haynes Family Corp. v. Dean Properties, Inc.*, 923 S.W.2d 465, 467 (Mo.App. S.D. 1996). *See also Wichita Falls Prod. Credit Ass'n*, 78 S.W.3d at 816 (noting "[b]ecause the Appellants' statement of facts violates Rule 84.04(c), this Court is justified in dismissing this appeal on this basis.").

The "Statement of Facts" in The Executive Board's brief sets forth an account of the facts that does not correspond to the factual statements in the consecutively numbered paragraphs of the various motions for summary judgment filed by WBCC, Hill, RTC, and the NCB defendants. We are unable to determine *from the Statement of Facts in The Executive Board's brief* which material facts were established by Respondents' various motions for summary judgment, nor can we determine which material facts, if any, pled by Respondents' motions, were properly denied by The Executive Boards' responses. *See Chopin*, 969 S.W. 2d at 251. The purpose of Rule

16

84.04(c) is to "define the scope of the controversy and afford the appellate court an immediate, accurate, complete, and unbiased understanding of the facts of the case." ***Thompson v. Flagstar Bank, FSB***, 299 S.W.3d 311, 314 (Mo.App. S.D. 2009) (internal quotation and citation omitted). We are simply unable to determine from The Executive Board's Statement of Facts which material facts were established by the motions for summary judgment and which material facts were properly denied in response. *See **Wichita Falls Prod. Credit Ass'n***, 78 S.W.3d at 816; ***Haynes Family Corp.***, 923 S.W.2d at 467 (holding failure to "substantially comply with Rule 84.04(c) preserves nothing for appellate review.").

Furthermore, The Executive Board's Statement of Facts improperly relies almost exclusively on the Collins Affidavit, which was stricken by the trial court. The Executive Board did not challenge the ruling as to the Collins Affidavit. Therefore, The Executive Board's reliance on the Collins Affidavit is improper, although its response contains references to the legal file citing Collins Affidavit at least 20 times in its brief.[13] *See **Miller v. River Hills Development***, 831 S.W.2d 756, 757 (Mo.App. E.D. 1992) (holding "[u]nless the record on appeal demonstrates that the documents purportedly relied upon in the trial court were properly made part of the trial record, we cannot say that they were considered by the trial court and they may not be considered on appeal."); ***Lay v. St. Louis Helicopter Airways, Inc.***, 869 S.W.2d 173, 174 (Mo.App. E.D. 1993) ("We cannot consider records that were not before the trial court."). The Executive Board's misguided reliance on the Collins Affidavit to support additional material facts alleged to be in dispute is fatal to The Executive Board's claims because we may not consider the Collins Affidavit on appeal. *Id.*

---

[13] The Executive Board's Statement of Additional Material Facts in Dispute filed in response to the motion for summary judgment references the Collins Affidavit over 80 times to argue additional material facts were still in dispute.

17

Our Supreme Court has instructed that "[a]n appellate court's role is to review specifically challenged trial court rulings, not to sift through the record . . . [and] assume the role of advocate." *Smith v. City of St. Louis*, 395 S.W.3d 20, 29 (Mo. banc 2013). It is not the function of this Court to develop the facts and thereby do the work of an advocate on appeal. *See id.*

> We adhere to the rule that an appellate court will not supply the deficiencies of an inadequate brief by independent, additional research because to do so would be inherently unfair to the opposition and parties in other cases awaiting disposition on appeal. We will not seine the record to locate factual support for assertions by the appellant.

*Anderson v. American Family Mut. Ins. Co.*, 173 S.W.3d 356, 359 (Mo.App. W.D. 2005) (internal quotations and citations omitted).

We hold The Executive Board's violation of Rule 84.04(c) warrants dismissal of this appeal, although we do not resort to that extreme remedy. We note that absent the motions to dismiss, our duty is to verify compliance with Rule 84.04, *sua sponte*, if necessary. *See Ward v. United Engineering Co.*, 249 S.W.3d 285, 287 (Mo.App. E.D. 2008). A brief containing violations of Rule 84.04, including Rule 84.04(c) violations, preserves nothing for this Court's review. *Tavacoli v. Division of Employment Sec.*, 261 S.W.3d 708, 710 (Mo.App. W.D. 2008). Occasionally, this Court reviews non-compliant briefs *ex gratia*. However, a violation of briefing rules may leave this Court nothing suitable even for *ex gratia* review. *See Jones v. Jones*, 819 S.W.2d 773, 774 (Mo.App. E.D. 1991). If addressing the appeal would require this Court to become an advocate for a party by searching the record for the facts of the case, we cannot do so. *See Willis v. Missouri Farm Bureau Services, Inc.*, 396 S.W.3d 451, 454 (Mo.App. W.D. 2013).

Here, The Executive Board's failure to comply with Rule 84.04 is so serious as to impede our appellate review. *See **Yates v. Briggs & Stratton***, 302 S.W.3d 776, 778 (Mo.App. S.D. 2010). The Executive Board has now presented its claim to a Missouri appellate court on four occasions, and at this stage, we simply cannot overlook The Executive Board's gross violations of Rule 84.04.[14]

### Conclusion

Because of our decision documenting The Executive Board's Rule 84.04 violations, there are no valid points before us; therefore, the judgments are affirmed in that The Executive Board has failed to persuade us as to the validity of its position. ***Hardy v. McNary***, 351 S.W.2d 17, 20 (Mo. 1961) (finding appellant has the burden of affirmatively establishing alleged error on appeal).

WILLIAM W. FRANCIS, JR., C.J. - OPINION AUTHOR

NANCY STEFFEN RAHMEYER, P.J. - Concurs

DANIEL E. SCOTT, J. - Concurs in Separate Opinion

---

[14] We do not have to reach other Rule 84.04 violations, including defective points relied on.

19



# Missouri Court of Appeals

## Southern District

### Division One

THE EXECUTIVE BOARD OF THE )
MISSOURI BAPTIST CONVENTION, )
)
      Plaintiff/Appellant, )
)
    vs. ) No. SD32699 and SD32735
) Consolidated
WINDERMERE BAPTIST CONFERENCE ) Filed: March 25, 2014
CENTER, INC., JAMES L. HILL, RELIANCE )
TRUST COMPANY, NATIONAL CITY BANK )
OF THE MIDWEST, CONSOLIDATED )
MORTGAGE, INC., and FIRST AMERICAN )
TITLE MISSOURI AGENCY, INC., )
)
      Defendants/Respondents. )

## OPINION CONCURRING IN RESULT

I concur in the result for slightly different reasons. The principal opinion charitably understates Appellant's disregard of Rule 84.04 and developed case law, but I think we can affirm on the merits as to two of Appellant's three pleaded counts.

*Counts I and II – Release*

For the express purposes "of resolving, settling and compromising any and all of [Hill] and [Appellant]'s potential disputes and to avoid the expense of further litigating the claims and defenses which each party may have," these two parties

mutually released each other – prior to this lawsuit – from *all* claims, causes of action, and liabilities "of whatever kind or nature, direct or indirect, in law, equity or otherwise, whether known or unknown, vested or contingent, suspected or unsuspected, which existed in the past or which currently exist ...."

This release is presumed valid,[1] so to avoid summary judgment, Appellant had to support its claim that Hill procured the release by fraud. If (as I believe) Appellant's fraud assertions hinged upon the Collins Affidavit stricken by the trial court, summary judgment was proper. Thus, I would affirm the judgment in Hill's favor on Counts I and II based on release.

*Count III – Rule 84.04*

Unfortunately, I cannot similarly overcome Appellant's Rule 84.04 violations as to its final pleaded count. At the risk of parroting the principal opinion's citations to ***Chopin v. AAA of Missouri***, 969 S.W.2d 248 (Mo.App. 1998), I quote that case liberally because it mirrors Appellant's failings and our dilemma caused thereby:

> Inasmuch as the trial court adjudicated this case by summary judgment, the facts on which the trial court based its decision were those established pursuant to Rule 74.04(c)(1) and (2). It is thus evident that in order to review the judgment, we must scrutinize those facts. Consequently, the statement of facts in [Appellant]'s brief should have set forth the material facts established by Rule 74.04(c)(1) and (2), together with the pages in the legal file where such facts are established.

*Id*. at 251.

But as in ***Chopin***, Appellant instead offers "an account of the facts that does not correspond to the factual statements in the consecutively numbered paragraphs

---

[1] ***Andes v. Albano***, 853 S.W.2d 936, 940 (Mo. banc 1993). Appellant's arguments to the contrary ring hollow.

2

of [Respondents'] motion[s]." ***Id***. "Therefore, we cannot determine *from the statement of facts in* [Appellant]*'s brief* which material facts were established by [Respondents'] motion[s], nor can we determine which material facts, if any, pled by [Respondents'] motion[s] were properly denied by [Appellant]'s response." ***Id***.

It was Appellant's duty "to define the scope of the controversy by stating the relevant facts fairly and concisely." ***Id***. "The purpose of the statement of facts is to afford an immediate, accurate, complete and unbiased understanding of the facts of the case." ***Id***. "A statement of facts containing practically no facts relating to any issue raised on appeal does not comply with Rule 84.04(c)." ***Id***.

Such observations, in ***Chopin***, drove us to conclusions equally fitting here:

> Because the statement of facts in Chopin's brief does not identify (1) the material facts established by Martindale's motion for summary judgment and Chopin's response, or (2) the material facts, if any, pled in Martindale's motion and properly denied by Chopin's response, we hold the statement of facts violates Rule 84.04(c). Violations of Rule 84.04(c) constitute grounds for dismissal of an appeal.
>
> We hold Chopin's violation of Rule 84.04(c) warrants dismissal of this appeal. However, as we are aware that dismissing it might possibly result in manifest injustice or miscarriage of justice, we have taken the precaution of reviewing the judgment under Rule 84.13(c). That rule empowers an appellate court, in its discretion, to consider plain errors, though not raised or preserved, if manifest injustice or miscarriage of justice resulted therefrom. Having gratuitously examined the record, we find no plain error justifying relief under that rule.

***Id***. (citations omitted). *See also **Jimmy Jones Excavation v. JDC Structural Concrete***, 404 S.W.3d 922, 923-24 (Mo.App. 2013); ***Wichita Falls PCA v. Dismang***, 78 S.W.3d 812, 815-16 (Mo.App. 2002).

Purposefully or otherwise, Appellant ignored these documented admonitions when compliance was all the more crucial due to the complexity of this case and its appellate record.[2]  This is not just a problem of making this court work harder.  Do we hedge our neutrality to keep Appellant "in the game" despite its rule violations?  Do we delay other cases and litigants, perhaps for weeks, while we do what Appellant should have done?  Such concerns admit of no hard and fast answers.

As in the cases cited above, I think a fair compromise is plain error review – is it manifestly unjust to enforce Rule 84.04?  The short answer, as in those cases, is "no." *Compare* ***Jimmy Jones Excavation***, 404 S.W.3d at 924 n.4; ***Dismang***, 78 S.W.3d at 816; ***Chopin***, 969 S.W.2d at 251.  I would reject Appellant's Count III challenges on this basis and, thus, reach the same result as the principal opinion.

DANIEL E. SCOTT, J. – SEPARATE OPINION AUTHOR

---

[2] This legal file exceeds 4,200 pages, divided into 34 separate PDF files, and is not word searchable.  For comparison, the legal file in ***Jimmy Jones Excavation*** was one-quarter this size.  404 S.W.3d at 923.