CORRECTED- 2/19/19



# In the
# Missouri Court of Appeals
# Western District

| | |
|---|---|
| THE EXECUTIVE BOARD OF THE MISSOURI BAPTIST CONVENTION, A MISSOURI NON-PROFIT CORPORATION, ET AL., AS REPRESENTATIVES OF THE MISSOURI BAPTIST CONVENTION, AN UNINCORPORATED ASSOCIATION, | WD81192 |
| **Respondent,** | **Consolidated Case:** WD81213 |
| v. | **OPINION FILED:** |
| MISSOURI BAPTIST UNIVERSITY, | **FEBRUARY 19, 2019** |
| **Appellant;** | |
| THE BAPTIST HOME, | |
| **Appellant.** | |

**Appeal from the Circuit Court of Cole County, Missouri**
**The Honorable Karl A. W. DeMarce, Judge**

**Before Division Three: Anthony Rex Gabbert, Presiding Judge,**
**Thomas N. Chapman, Judge, Alok Ahuja, Judge**

Appellants Missouri Baptist University ("the University") and The Baptist Home ("the Home") appeal a circuit court's grant of summary judgment in favor of the Executive Board of the Missouri Baptist Convention, et al. ("the Convention") in a civil action seeking, *inter alia*, declaratory judgment. The University presents ten points on appeal, asserting that:

    I.    The trial court erred in granting summary judgment against the University because the Convention did not negate the University's breach of fiduciary duty affirmative

defense in that the factual record shows that the parties were in a fiduciary relationship, and the Convention breached its fiduciary duties before the 2001 Charter amendment by its improper conduct;

II.    The trial court erred in granting summary judgment against the University because the Convention did not negate the University's unclean hands affirmative defense in that the factual record indicated that before the 2001 Charter amendment, the Convention acted improperly, harmfully and not in good faith;

III.   The trial court erred in granting the Convention's motion for partial summary judgment against the University because the Convention did not negate the University's affirmative defense that the parties were in a voluntary relationship;

IV.    The trial court erred in granting summary judgment against the University and holding that the University's 1997 Charter did not establish a contractual or a third party beneficiary relationship with the Convention and that the University thereby could not raise "contract-based" affirmative defenses;

V.     The trial court erred in granting the Convention's motion for partial summary judgment against the University because the Convention did not negate the University's affirmative defense that the Convention breached the implied covenant of good faith and fair dealing in that the factual record indicated the Convention acted in bad faith in the trustee nomination process, and it took actions that were not in the University's best interests;

VI.    The trial court erred in granting the Convention's motion for partial summary judgment against the University because the Convention did not negate the University's failure of consideration affirmative defense;

VII.   The trial court erred in granting the Convention's motion for partial summary judgment against the University because the Convention did not negate the University's affirmative defense that the Convention was the first to breach the University's 1997 Charter and that it consequently forfeited any enforcement rights it had, if any;

VIII.  The trial court erred in entering judgment against the University because the Convention lacked standing to assert its Count IV claim pursuant to § 355.141, RSMo., because claims under § 355.141 can only be brought by the Missouri Attorney General or a member or trustee of the University, and the Convention is none of those persons, and that the Convention's claims that the University violated its charter violated § 355.606 as a challenges to the power of the University to act;

IX.    The trial court erred in entering judgment against the University and declining to address numerous University defenses on the grounds that the court would entangle itself in ecclesiastic issues because the University's defenses did not involve ecclesiastic disputes, in that those defenses could be decided on neutral principles

2

of law, did not require deciding or weighing religious or ministerial issues, and the defenses were based upon corporate governance documents, corporate procedural statutes, inequitable non-religious conduct and did not arise from religious disputes or religious principles;

X.    The trial court erred in granting summary judgment and holding that the University's affirmative defenses in paragraphs 309, 312, and 323 were not adequately pled pursuant to Rule 55.08 because the University set forth a short and plain statement of facts supporting each defense.

The Home raises three points on appeal, asserting the circuit erred:

I.    In granting summary judgment in favor of Respondents because they do not have standing to pursue their claims because they are not authorized to do so by statute, they lack "special interest" standing to assert their claims, and lack any other basis under Missouri law to bring their claims;

II.    In granting summary judgment in favor of Respondents because The Baptist Home's 1960 articles, which grant Respondent third-party approval privileges, were void *ab initio*, because they granted privileges prohibited by the governing law at that time, and they still failed to comply with the 1994 act revising the law;

III.    In denying The Baptist Home's Motion to Amend, Correct or Modify the Final Judgment because the Judgment includes two relevant findings of fact which are plainly inaccurate and without support in the record.

We affirm.

# BACKGROUND

The Convention is an unincorporated association, whose members, individually known as "messengers," are selected by their respective Baptist churches. The messengers attend and vote at the Convention's annual meetings. Baptist churches are not members of the Convention and do not vote. The Executive Board of the Missouri Baptist Convention, which acts on the Convention's behalf, is a Missouri nonprofit corporation made up of elected officials and other messengers.[1]

---

[1]    We explored the relationship between the Convention and the Executive Board of the Missouri Baptist Convention at length in *Executive Bd. of the Missouri Baptist Convention v. Carnahan*. 170 S.W.3d 437 (Mo. App. 2005).

The University is a non-profit corporation originally incorporated in 1964 as "Missouri Baptist College." The University's original 1964 Articles of Incorporation gave the Convention various rights including the right to approve or reject any amendments to the University's articles and the right to appoint and remove members of the board of trustees. The University merged with another college in 1967, and the new articles preserved the aforementioned rights. The University next amended its articles in 1982, and it did so with the Convention's approval. It amended its articles once more in 1997, again with the Convention's approval. (The "1997 Articles.") Throughout all of these amendments, the Convention retained its rights to approve or reject amendments to the University's articles and appoint and remove trustees for the University's board.

In regards to the Convention's approval rights over article amendments, the 1997 Articles state, in relevant part, that the University's "board of trustees may adopt one or more amendments to these articles of incorporation subject to the approval of the Missouri Baptist Convention upon recommendation of the Executive Board of the Missouri Baptist Convention." L.F. Doc. #197 at 4. In regards to the Convention's right to appoint and remove trustees, the 1997 Articles state that the University's "board of trustees shall consist of twenty-seven persons appointed by the Missouri Baptist Convention," of which, at "least seventy-five (75) percent of the trustees shall be members of [churches] affiliated with the Missouri Baptist Convention." *Id.* at 3-4. The trustees serve terms of three years, and "[n]o member who has served three successive terms, or parts thereof, shall be eligible for re-election until after the expiration of one year." *Id.* at 4.

In 2001, the University filed amendments to their articles with the Missouri Secretary of State. (The "2001 Articles.") The 2001 Articles completely eliminated all rights enjoyed by the Convention under the 1997 Articles. Unlike with previous amendments, the University did not

4

seek the Convention's approval for the 2001 Articles, and the Convention, during a meeting in 2001, expressly disapproved of the University's 2001 Articles. The Convention also demanded that the University restore the 1997 Articles including the Convention's rights set forth in the same.

The Home is a Missouri non-profit corporation first created in 1959 and originally known as the "The Home for Aged Baptists." In 1960, The Home amended its Articles of Agreement which state, in relevant part, as follows:

ARTICLE VI. Powers
...
Section 2. The corporation shall also have the power to receive, to hold, to alienate, mortgage and convey real and personal property … PROVIDED, always that final approval of the Missouri Baptist Convention is obtained before any real property owned by the corporation on the Home site which is the site of the Home for Aged Baptists is encumbered in any manner or sold.

Section 3. If at any time said corporation, "The Home for Aged Baptists" shall cease to operate as such for the purposes and objects as set out herein all of the assets of the corporation shall be disposed of by the Trustees of corporation as directed by [the Convention] and shall be construed to be the property of the Missouri Baptist Convention. …

ARTICLE VII. Affiliation and Government
Section 1. This corporation shall be affiliated with and subject to the Missouri Baptist Convention. The members of the Board of Trustees of this corporation shall be nominated and elected by the Missouri Baptist Convention… Vacancies occurring on the Board of Trustees of this corporation shall be filled, for unexpired term of said Trustee, by the Executive Board of the Missouri Baptist Convention.
...

ARTICLE IX. Amendments
This agreement of the corporation may be amended by an affirmative vote of two-thirds (2/3) of the members of the Board of Trustees… provided said Amendment is approved by the Missouri Baptist Convention.

A107-09. The Home amended its articles in 1978 to change its name to "The Baptist Home." The Home sought and received approval from the Convention for this change pursuant to the consent clause. Other than the name change, the Home's articles were otherwise unaltered by the 1978 amendment.

5

In September of 2000, the Home's Board of Trustees adopted amendments to the Home's articles which eliminated the Convention's right to have any control whatsoever over the Home's disposition of property, including in the event of dissolution; the right to have the Home be affiliated to the Convention; the right to select and replace the Home's trustees; and the right to approve or reject amendments to the Home's articles. The Home did not seek, nor did the Convention give, approval for these amendments. Indeed, the Convention expressly disapproved of the Home's 2000 amendments in writing. Since 2000, the Home has refused to seat any of the Trustees selected by the Convention. In addition, in August of 2000, the Home transferred endowment funds into a newly created legal entity, the Missouri Baptist Home Foundation, Inc. The formation of the foundation and the transfer of assets to it was also not approved by the Convention.

In August of 2002, the Convention filed suit against the Home, the University, and several other Convention affiliated agencies. On September 28, 2006, the Convention filed its Fifth Amended Petition against Appellants asserting, *inter alia*, claims against the Home for declaratory judgment (Count I) and against the University for declaratory judgment (Count IV).[2]

Count I alleges the Home's 2000 Charter was *void ab initio* in that the 2000 amendments were not approved by the Convention in violation of the Home's charter, or, in the alternative, they were *void ab initio* because the Charter constituted an attempt by the Home to extinguish the Convention's rights in violation of RSMo. Section 355.606 and common law.[3] Count IV alleges the University's 2001 Charter was void or invalid because it was enacted in violation of the 1997 Charter and Section 355.606. Count IV also alleges the University's 1997 Charter established a

---

[2] All other claims pending against Appellants have been disposed of in various ways and are not at issue in this appeal. Additionally, claims against the other parties were all disposed of prior to this appeal.

[3] All statutory references are to the Revised Statutes of Missouri, RSMo 2000, unless otherwise specified.

contractual or third-party beneficiary relationship between the University and the Convention.

In its Answer, the Home set forth various affirmative defenses including that the Convention lacked standing to bring this suit and that the third-party consent provision giving the Convention approval rights over amendments to the Home's articles was *void ab initio* because Missouri law did not permit third-party consent provisions at the time the Home's articles were originally drafted. The University also set forth numerous affirmative defenses in its Answer including breach of fiduciary duty; unclean hands; breach of implied covenant of good faith and fair dealing; failure of consideration; that to the extent there was a contractual relationship between the parties the Convention was the first to breach that contract; that the Convention, as an unincorporated association, was incapable of contracting and thus could not bring contract-based suits; that the relationship between the Convention and the University was voluntary and terminable at will; and that the Convention lacked standing to bring this suit.

In December of 2016, the Convention filed motions for partial summary judgment on Counts I and IV against the Home and University, respectively. Oral argument was heard on the motion on September 18, 2017. The circuit court sustained the motion on September 27, 2017 and entered its final judgment. This appeal followed. Additional facts will be discussed below as needed.

## DISCUSSION

"When considering appeals from summary judgments, [we] review the record in the light most favorable to the party against whom judgment was entered," and we afford that party the "benefit of all reasonable inferences." *ITT Commercial Fin. Corp. v. Mid–America Marine Supply Corp.,* 854 S.W.2d 371, 376 (Mo. banc 1993). We review the circuit court's granting of summary judgment *de novo*. *Id.* "The propriety of summary judgment is purely an issue of

7

law." *Id.* Because the circuit court's judgment is based on the record submitted and the law, we need not defer to the circuit court's order granting summary judgment. *Id.* We will affirm the circuit court's grant of summary judgment if no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. *Id.* at 380.

Many of the University's and the Home's points relied on are both dependent on and overlap with one another. We thus address and organize the Appellants' points in the order most logical for our review. We first address the University's standing argument under Point VIII, as "[s]tanding is a necessary component of a justiciable case that must be present prior to adjudication on the merits." *Schweich v. Nixon*, 408 S.W.3d 769, 774 (Mo. banc 2013) (citations omitted). We will address the Home's first point along with the University's Point VIII as it also addresses standing. We next turn to the University's Point IX, which we prioritize because its concern with ecclesiastical disputes potentially deprives us of authority to address the merits of the University's claims and is potentially dispositive of a number of the University's arguments on appeal. Point X argues for the sufficiency of the University's affirmative defense pleadings. We hold that we do not have authority to address many of the University's defenses because they concern ecclesiastical matters, and that all of the University's defenses were improperly pled. Because these serve as independent grounds sufficient to dispose of all of the University's affirmative defenses, the University's remaining points fail for mootness. We will then address the Home's second and third points on appeal.

**Point VIII**

In Point VIII, the University argues the circuit court erred in finding the Convention had standing to sue, because its claim at issue, made pursuant to § 355.141, constitutes a challenge to the power of the University to act, and such challenges can only be brought by the Missouri

8

Attorney General, a director, or a member or trustee of the University. The University further argues that because the Convention is not a member of the University, the Convention has no standing to bring a claim. In The Home's first point on appeal, it raises similar arguments, and then argues that the Convention also lacks "special interest" standing to bring this case. We conclude that the third-party consent clauses present in the Appellants' articles vest the Convention with enforceable rights, and in turn, standing to bring this suit.

"Standing is a necessary component of a justiciable case that must be shown to be present prior to adjudication on the merits." *Schweich*, 408 S.W.3d at 774. "Standing is a question of law, which this Court reviews *de novo*." *Lebeau v. Comm'rs of Franklin County*, 422 S.W.3d 284, 288 (Mo. banc 2011) (citation omitted).

As a general rule, a third party has no authority to challenge a nonprofit corporation's power to act. Section 355.141.1 states, "[e]xcept as provided in subsection 2 of this section, the validity of corporate action may not be challenged on the ground that the corporation lacks or lacked power to act." Section 355.141.2 provides, a "corporation's power to act may be challenged in a proceeding against the corporation to enjoin an act where a third party *has not acquired rights*. The proceeding may be brought by the attorney general, a director, or by a member or members in a derivative proceeding." (Emphasis added).

We explored these statutory provisions at length in *Executive Bd. of Missouri Baptist Convention v. Windermere Baptist Conference Center*, 280 S.W.3d 678 (Mo. App. 2009) (*Windermere II*)[4], a case the University relies on heavily to support the proposition that the

---

[4] The case designated *Windermere II* was the second in a long line of cases involving the Convention and Windermere Baptist Conference Center. These cases extend from 2005 to 2014: *Executive Bd. of Missouri Baptist Convention v. Carnahan,* 170 S.W.3d 437 (Mo. App. 2005) (*Windermere I*); *Executive Bd. v. Windermere Baptist Conference Center*, 280 S.W.3d 678 (Mo. App. 2009) (*Windermere II*); *Atkins v. Jester,* 309 S.W.3d 418 (Mo. App. 2010) (*Windermere III* ); *Executive Bd. v. Windermere*, 430 S.W.3d 274 (Mo. App. 2014) (*Windermere IV*).

9

Convention lacks standing to challenge the University's decision to amend its articles. In *Windermere II*, we considered whether the Convention had standing to challenge the power of Windermere, another nonprofit corporation, to amend its articles of incorporation. We concluded:

> [Section 355.141] provides that a corporation's power to act may be challenged only by the attorney general, a director, or members in a derivative proceeding. Because the Convention does not fall within one of these three categories of persons entitled to challenge [the corporation's] power to amend its articles of incorporation, the Convention lacks standing to challenge [the corporation's] authority to amend the articles of incorporation.

*Id.* at 693 (citing *Blue Cross & Blue Shield of Missouri v. Nixon*, 81 S.W.3d 546, 553 (Mo. App. 2002)). However, in *Windermere II*, we noted that "nothing in the articles prevented Windermere from unilaterally amending its articles." *Id.* at 692. As we explained, "[t]he rights given to the Convention under Windermere's original articles of incorporation were not 'fixed, unalterable, irrevocable' rights but were rights subject to amendment by Windermere. Windermere's original articles, therefore, did not create any enforceable contract rights for non-members like the Convention." *Id.* We also noted that the Convention opted not to preserve its "alleged rights" when it failed to include a third-party consent clause in Windermere's articles as authorized by § 355.606. *Id.* at 692

We further explored the Convention's standing to bring suit in another appeal, *Executive Bd. of the Missouri Baptist Convention v. Missouri Baptist Foundation*, 497 S.W.3d 785 (Mo. App. 2016) (*Foundation II*)[5], where we held that the Convention had "special interest" standing to challenge the Missouri Baptist Foundation's effort to change its articles. As Appellants have rightly pointed out, the Missouri Baptist Foundation, a chapter 352 nonprofit, is not subject to the same statutory provisions at issue here, and in turn, Appellants are not necessarily subject to the

---

[5] The cited case is the second of two cases involving the Convention and the Missouri Baptist Foundation. The first case is *Executive Board of the Missouri Baptist Convention v. Missouri Baptist Foundation*, 380 S.W.3d 599 (Mo. App. 2012).

same "special interest" standing doctrine we applied in that case. However, we briefly noted in *Foundation II* that a key distinction between *Windermere II*, where the Convention lacked standing, and *Foundation II*, where it had standing, was the fact that the Foundation was prevented from unilaterally amending its charter without Convention approval through an enforceable, third-party consent clause. *Foundation II*, 497 S.W.3d at 798 n. 11.

Here, the University's 1997 Charter explicitly states that "[t]he board of trustees may adopt one or more amendments to these articles of incorporation subject to the approval of the Missouri Baptist Convention upon recommendation of the Executive Board of Missouri Baptist Convention." The Home's 1960 amended articles state that the articles may be amended by the board of trustees "provided said Amendment is approved by the Missouri Baptist Convention." With both Appellants, the third-party consent clauses clearly vest the Convention with "fixed, unalterable, irrevocable" and "enforceable contract rights for non-members" like the Convention. Section 355.141 does not apply. The Convention has standing to bring this suit. The University's Point VIII and the Home's Point I are denied. Because standing was an affirmative defense presented in paragraph 309 of the University's Answer, we have also disposed of that defense to the extent it is raised in other points in the University's brief.

**Point IX**

In Point IX, the University argues the circuit court erred in finding the court could not address some of the University's affirmative defenses without entangling itself in ecclesiastical disputes. The University claims that those defenses did not involve ecclesiastical disputes and could be decided on neutral principles of law. In support, the University cites numerous cases where Missouri courts addressed various disputes concerning, *inter alia*, church bylaws and articles or the selection of board members for religious organizations. The University next argues

11

that the Convention itself has disputed that religious concerns motivated various actions taken by the Convention. Because the Convention claims that its own actions were religiously neutral, the University argues, courts can consider the University's proffered defenses without addressing ecclesiastical matters.

The Establishment Clause provides, in relevant part, that "Congress shall make no law respecting an establishment of religion[.]" U.S. Const., Amend. I. As a First Amendment provision, the Establishment Clause applies to the states by incorporation into the Fourteenth Amendment. *Gibson v. Brewer*, 952 S.W.2d 239, 246 (Mo. banc 1997). The "First Amendment does not preclude the court's involvement in church disputes where the issue is one which deals purely with a religiously neutral civil law." *First Missionary Baptist Church v. Rollins*, 199 S.W.3d 823, 827 (Mo. App. 2006) (citation omitted). "Courts may exercise jurisdiction in disputes having no issues of religious doctrine, policy and practice so long as courts utilize a neutral-principles-of-law approach and judges do not become entangled in questions which are essentially religious." *Id.* At the same time, we must not "probe deeply enough into the allocation of power within a [church] so as to decide … religious law." *Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 709 (1976).

The University cites numerous cases where Missouri courts have addressed a variety of disputes involving religious organizations concerning leadership elections, bylaws and articles, and even who is or is not a member of a religious institution. For example, in *Fast v. Smyth*, a case where competing factions were vying for control of a church facing trusteeship, we held that a number of individuals were not properly made members of the church, and, in turn, were properly denied the right to vote on church affairs. 527 S.W.2d 673 (Mo. App. 1975). In *First Missionary Baptist Church v. Rollins,* the court affirmed a circuit court's decision ordering a leadership

12

election and determining that certain individuals were not church members and were therefore not eligible to vote. 199 S.W.3d 823. These cases, along with numerous others presented by the University, establish that a court can rule on claims and defenses addressing a dispute over corporate articles even where control of a religious institution is implicated.

We are not convinced that a case relied on by the circuit court, *Hosanna-Tabor Evangelical Lutheran Church and School v. E.E.O.C.*, 565 U.S. 171 (2012), presents any bar to deciding issues present in this case. In *Hosanna-Tabor*, the Supreme Court of the United States concluded that a teacher at a Lutheran school was a minister for purposes of the "ministerial exception" which precludes claims concerning the employment relationship between a religious institution and its ministers. 565 U.S. at 190. The circuit court suggested that the University's trustees could be considered "ministers" under *Hosanna-Tabor's* analysis, and that it was in danger of imposing unwanted minsters on a religious body by addressing the University's affirmative defenses.

However, the teacher in *Hosanna-Tabor* is easily distinguishable from the board of trustees in the present case. As the Supreme Court explained,

> Hosanna–Tabor held [the teacher] out as a minister, with a role distinct from that of most of its members. When Hosanna–Tabor extended her a call, it issued her a "diploma of vocation" according her the title "Minister of Religion, Commissioned." She was tasked with performing that office "according to the Word of God and the confessional standards of the Evangelical Lutheran Church as drawn from the Sacred Scriptures." The congregation prayed that God "bless [her] ministrations to the glory of His holy name, [and] the building of His church." In a supplement to the diploma, the congregation undertook to periodically review [the teacher's] "skills of ministry" and "ministerial responsibilities," and to provide for her "continuing education as a professional person in the ministry of the Gospel."

*Hosanna-Tabor,* 565 U.S. at 191 (citations omitted). Additionally, the teacher held herself out as a minister of the Church, and to fulfill her responsibilities in carrying out the Church's religious mission, she "taught her students religion four days a week, and led them in prayer three times a day." *Id.* at 192. Thus, "[a]s a source of religious instruction, [the teacher] performed an important

13

role in transmitting the Lutheran faith to the next generation." *Id.*

There is no indication that the University's board of trustees operate in the ministerial capacity described in *Hosanna-Tabor*. We further observe that in *Hosanna-Tabor* the ministerial exception was held to operate "as an affirmative defense to an otherwise cognizable claim" for employment discrimination, and that lower courts were not jurisdictionally barred from considering discrimination claims involving religious institutions. *Hosanna-Tabor,* 565 U.S. at 195 n.4 (citation omitted). Also, as an employment discrimination case, the legal context of *Hosana-Tabor* is vastly different than the case at bar. In employment cases, the relief sought is often reinstatement where courts might compel the defendant to employ the plaintiff, meaning a church might be forced to employ a minister it finds objectionable on religious grounds. Employment discrimination cases also require intense factual inquiries where courts often consider the extent to which a proffered reason for an employee's termination is pretextual, meaning that if a church provided a religious reason for the termination of a plaintiff minister, a court would be required to assess the weight or sincerity of the proffered religious belief. In this case, we are concerned with whether or not the provisions of corporate articles filed with the state were properly followed, and although our decision might impact who serves as a University trustee, that impact is incidental to the primary question before the court. Nonetheless, although we do not hold that we are barred from ruling on the University's defenses in terms as broad as those suggested by the circuit court, the circuit court's analysis of the ecclesiastical matters implicated in this case is otherwise quite prudent.

For example, in its Answer the University alleges that the Convention demanded that it and other affiliated universities refrain from teaching material that contradicted certain ideas which are clearly religious doctrine, such as the belief that the Earth was created in seven days roughly 6,000

14

years ago, or the belief that every living thing on Earth is descended from animals rescued from a flood on a vessel roughly 4,300 years ago. L.F. Doc. #192, 26-28. The University claims that these demands regarding academic curriculum "anticipatorily breached" provisions of a document entitled "A Christian Higher Education: A Statement of Purpose" which states, in part, that "[t]he subject matter for education is life itself, in its wholeness. Thus, Christian education proceeds without fear into whatever knowledge may come." *Id.* at 26. The document then states that the "Christian college has as its purpose the discovery, preservation and transmission of truth." *Id.*

By presenting its affirmative defense thusly, the University is asking a court to consider whether the Convention anticipatorily breached a document stating, in part, that the University's purpose was the "transmission of truth" by dictating curriculum related to creationism and the story of Noah's ark. Considering this defense as it currently is presented requires a court to rule – at least implicitly - on the truth of the story of Noah's ark or Christian beliefs in creationism. We cannot conceive of a judicial inquiry which would impose on ecclesiastical matters more than this, nor can we find fault in the circuit court's unwillingness to even attempt to find neutral grounds upon which it could rule when the color and content of the University's allegations are so nakedly religious.

Even where the University does not invoke obviously religious considerations in its filings, it describes an ideological battle between conservative messengers and moderate messengers where the conservatives took actions to move the Convention and its affiliated agencies to the right. In its brief, the University describes "Project 1000," a "group that sought to recruit messengers to attend the annual Convention to elect conservatives to boards and other leadership positions." App. Brief at 15. The University then claims that a number of changes to the Convention's nominating procedures and guidelines were intended to appoint conservatives to

15

leadership positions in the Convention and with affiliated agencies. *Id.* at 15 – 19. The same allegations can be seen in the University's Memorandum in Opposition to the Convention's Motion for Partial Summary Judgment. L.F. Doc. #215 at 12-14. And in its Answer, the University claims that as part of its "Covenant Relationship" with the Convention it interacted with the Convention in "accordance with Baptist polity." L.F. Doc. #192 at 23. Later, it cited the Convention's Third Amended Petition when it stated that "the Convention has come [to] be controlled by a cadre of self-proclaimed 'conservatives' who replaced those whom they pejoratively call 'moderates,' with an objective to move the Convention from what the 'conservatives' call 'left of center' to 'right of center.'" *Id.* at 26.

In reading the University's various allegations regarding the ideological battle allegedly taking place within the Convention, we cannot help but consider the United States Supreme Court's guidance in *Serbian E. Orthodox Diocese v. Milivojevich*, cited *supra*, to avoid probing too deeply into the internal affairs of church bodies. There, the Court further cautioned that even when resolving church civil or property disputes, we should avoid "resolving underlying controversies over religious doctrine." 426 U.S. at 710 (citation omitted). "This principle applies with equal force to church disputes over church polity and church administration." *Id*. By referring repeatedly to the religious and ideological motivations animating the Convention's actions, and by then relying on that motivation to justify the application of various affirmative defenses, the University would have this Court hold that religious adherents changing organizational policy to better align with religious doctrine as they understand it constitutes unclean hands, a breach of fiduciary duty, or a breach of the implied covenant of good faith and fair dealing.[6] This we must not do.

---

[6] We by no means intend to suggest that these defenses - and various others presented by the University - can never be properly pled in cases involving religious institutions.

16

Our analysis and the circuit court's is in line with the aforementioned cases cited by the University. In *Fast*, our decision that certain individuals were not members of the church may seem to impose on ecclesiastical matters where membership requirements included the acceptance of certain religious beliefs and the performance of certain rituals. 527 S.W.2d at 677. However, the evidence showed that there was a "regularly prescribed method" for becoming a member, and despite the religious character of that method, "substantial evidence" established that certain individuals had objectively failed to complete that method in accordance with clear criteria established in the church's governing documents and elsewhere. *Id*. at 677-78. Specifically, their membership status was not voted on at a properly called church meeting and their names were not recorded in the membership rolls. *Id*. In *First Missionary Baptist Church*, the court, ordering an election under the provisions of § 355.081, relied on a church directory to determine the church membership. 199 S.W.3d at 829-30. Again, the court was able to settle the dispute on neutral grounds, without considering religious questions. Here, by arguing that the teaching of religious doctrine breaches a separate document regarding "Christian Higher Education;" that the teaching of religious doctrine is not in the best interest of the institution or its stakeholders; or that the actions of the Convention are the result of a struggle between religious conservatives and moderates, the University strays painfully far from any neutral principle of law upon which we could rule.

We next turn to the University's contradictory argument that we should accept the Convention's assertions that its actions were not religiously motivated. This argument is of no help to the University's case. Summary judgment requires us to make all reasonable inferences in the non-moving party's favor, which in the instant case means that we should accept as true the University's narrative that the Convention's actions were religiously motivated. And yet,

17

accepting this means also accepting that the University's defenses deal with ecclesiastical matters outside of our authority. If, as the University now asks, we accept the Convention's explanation for its actions as true, the University's affirmative defenses are without factual support, and the Convention is entitled to summary judgment as a matter of law.

Point IX is denied. Because the University incorporated by reference the above allegations into affirmative defenses pled throughout their Answer, those defenses also implicate ecclesiastical matters and cannot be addressed by this Court. We will discuss the University's practice of incorporating allegations by reference in their pleadings at greater length in our discussion of Point X below.

**Point X**

Under Point X, the University argues the court erred in finding its affirmative defenses were inadequately pled as required by Rule 55.08. In its Order, the circuit court quoted our holding in *Foundation II* when it held that the affirmative defenses found in paragraphs 309, 312, 322, and 323 of the University's Answer were inadequately pled. In its brief, the University first claims that the circuit court, without explaining or elaborating on its conclusion, simply stated that the court rejected its defenses. The University seems to follow suit, by flatly stating on appeal, with minimal authority or supporting arguments, that its pleadings were sufficient under the rule. We disagree.

Citing well-worn provisions of law as well as the rule itself, we discussed Rule 55.08's importance in *Foundation II*, the law of the case which the University appears to have completely ignored. There, we stated:

> It is true that a plaintiff desiring a grant of summary judgment must establish a right to judgment as a matter of law, which includes the obligation to establish that there is no genuine dispute as to the existence of facts necessary to support a defendant's affirmative defense. This presumes, however, that an affirmative defense has been properly

18

pled. Rule 55.08 requires a "pleading that sets forth an affirmative defense [to] contain a short and plain statement of the facts showing that the pleader is entitled to the defense . . . ." Bare legal assertions are insufficient to plead an affirmative defense. A pleading that makes a conclusory statement and does not plead the specific facts required to support the affirmative defense fails to adequately raise the alleged affirmative defense, and the alleged affirmative defense fails as a matter of law."

*Foundation II*, 497 S.W.3d at 801 (citations omitted).

Bare legal assertions are insufficient to support an affirmative defense, because the defense is "asserted by the pleading of *additional* facts not necessary to support a plaintiff's case which serve to avoid the [defendant's] legal responsibility even though [the plaintiff's] allegations are sustained by the evidence." *Ditto Inc. v. Davids*, 457 S.W.3d 1, 15 (Mo. App. 2014) (quoting *ITT Commercial Fin. Corp. v. Mid-America Marine Supply Corp.*, 854 S.W.2d 371, 383 (Mo. banc 1993)). "The effect of a deficiently pled affirmative defense is the same as if no attempt is made to allege a defense." *Ditto*, 457 S.W.3d at 16. "Issues not properly raised in an answer are not preserved for determination in a lawsuit." *Id.* (citing *Green v. City of St. Louis*, 870 S.W.2d 794, 797 (Mo. banc 1994).

Furthermore, pleading facts sufficient to support an affirmative defense in summary judgment pleadings does nothing to cure the initial failure to properly plead them in an Answer. *Ditto*, 457 S.W.3d at 16. This is because "the purpose of Rule 55.08 is to provide notice to the plaintiff so the plaintiff can be prepared for [judgment] on the issues." *Mobley v. Baker*, 72 S.W.3d 251, 258 (Mo. App. 2002). "Requiring a 'claimant' to negate such conclusory allegations as a prerequisite to summary judgment would require that party to first make the non-movant's case and then defeat it." *ITT Commercial Fin. Corp.*, 854 S.W.2d at 384 (Mo. banc 1993). Thus, a party moving for summary judgment "is not required to negate [an improperly pled defense] in order to make a *prima facie* case for summary judgment." *Old Republic Nat'l Title Ins. Co. v. Cox*, 453 S.W.3d 780, 787 (Mo. App. 2014) (citation omitted).

We find that the University's defenses, both individually and collectively, are so convoluted no court could reasonably expect a plaintiff to reply to them, nor would any court consider them for their intended purpose of shielding a defendant from liability. Often multiple defenses are haphazardly grouped together and accompanied by a collection of paragraph numbers offered in support. The defenses are at once deficient for being too short, in that they offer only a bare legal conclusion, and yet not plain, in that the plaintiff must follow a byzantine maze of cross-referenced paragraphs. For example, paragraph 312 provides:

> Any claim for specific performance or to otherwise invalidate [the University's] 2001 Charter and reinstate [the University's] 1997 Charter should be denied and is barred because the purported contract between the parties was unfair and without mutuality; therefore, such a remedy would be inequitable, result in injustice and, after consideration of the Convention's conduct as described in paragraphs 312, 313, 314.6.1, 314.6.2, 314.6.3, and 314.6.4, would be inappropriate, would threaten [the University's] educational accreditation, would harm the best interests of [the University's] students, and result in the Convention appointing individuals to [the University's] board of trustees who would put the perceived interest of the Convention and its policies or agenda ahead of the best interest of [the University] all in violation of the fiduciary duties owed by [the University] trustees to [the University.]

L.F. Doc. #192 at 22. In its brief, the University argues that this paragraph properly sets forth "affirmative defenses of breach of fiduciary duty, breach of the implied covenant of good faith, unclean hands and the Convention's own prior breach of the University's charter." App. Brief at 74. It would seem the University itself is confused by its Answer as the above quoted paragraph makes no mention of "unclean hands" or the "implied covenant of good faith" as mentioned in its brief. Perhaps those defenses are to be found elsewhere in the University's web of cross-referenced paragraphs. Additionally, by their own admission, the University is invoking no fewer than four distinct defenses in the span of a sentence, which is repeated at multiple points in their Answer.

Paragraph 322 raises the defense of waiver, on the basis, with no factual support otherwise in sight, that the Convention failed to "promptly object to amendments" made by the University.

20

L.F. Doc. #192 at 32. And, in a similar pattern as before, paragraph 323 asserts the defenses "of waiver, laches, and estoppel." In their Brief the University contends this paragraph sets for the defense of waiver, making no mention of laches and estoppel. App. Brief at 75.

Further complicating its Answer is the University's habit of incorporating paragraph 314 by reference into other affirmative defenses. Paragraph 314 extends for approximately seven pages, and it includes facts intended to support the defenses pled elsewhere in the Answer, but also pleadings for additional defenses (e.g., breach of the covenant of good faith and fair dealing, voluntary relationship, lack of standing). We do not mean to suggest that the practice of using cross-references and incorporating by reference is, by itself, a violation of Rule 55.08. In the present case, however, the practice rendered the Answer incomprehensible. If the Convention were able to discern which of the several defenses mentioned in a paragraph was actually being invoked, it then had to follow a trail of breadcrumbs through several incorporated paragraphs to determine which facts may or may not need refuting to defeat whatever defense it thinks the University asserted.

The cross references used here also succeed in complicating matters for courts. We often discuss the need for proper briefing before appellate courts, not only to allow the respondent to address the points relied on, but to facilitate courts' efficient disposition of claims. *See, e.g.*, *Thummel v. King,* 570 S.W.2d 679, 686 (Mo. banc 1978). The same is true of pleadings for any court trying to rule on them. Moreover, for a court to consider the affirmative defenses set forth in such a maze of a pleading, it would begin to function as an advocate as it attempted to match asserted defenses with the cross-referenced facts it finds most relevant. And because paragraph 314 contains all of the facts dealing with ecclesiastical matters discussed above, a court would have to search for relevant facts while avoiding allegations outside of its authority. The end result

21

is that the pleadings present a Gordian knot which no court should endeavor to untangle.

Accordingly, as these pleadings clearly violate Rule 55.08's dual requirement of setting forth both short and plain statements of fact, Point X is denied. Because Points VIII, IX, and X provide independent bases for rejecting all of the University's affirmative defenses at issue on this appeal, we will not consider the University's remaining points as they are moot. We next turn to the Home's remaining two points.

**Point II**

For its second point, the Home argues that the third party consent clause in the Home's original articles was *void ab initio* because the provisions of Chapter 355 in effect when the articles were filed did not allow for such clauses. Furthermore, the Home argues, the 1994 amendments to Chapter 355, which explicitly authorized the use of third-party consent clauses, was not retroactive. Finally, the Home contends that even if we were to hold the clause was allowed under either the 1959 or the 1994 law, the articles still did not comply with the statute as they did not require that the Convention approve amendments in writing, as set forth in § 355.606 (1995).

We review issues of statutory interpretation *de novo*. *South Metro Fire Prot. Dist. v. City of Lee's Summit*, 278 S.W.3d 659, 666 (Mo. banc 2009). When construing Chapter 355 we must "ascertain the intent of the legislature from the language used, to give effect to that intent if possible, and to consider words used in the statute in their plain and ordinary meaning." *Higgins v. Mo. Div. of Empl. Sec.,* 167 S.W.3d 275, 282 (Mo. App. 2005) (citation omitted). "Where the language of the statute is ambiguous or where its plain meaning would lead to an illogical result, then this court will look past the plain and ordinary meaning of a statute." *Id*. "The provisions of a legislative act must be construed and considered together and, if possible, all provisions

22

must be harmonized and every clause given some meaning." *State ex rel. Lavender Farms, LLC v. Ashcroft*, 558 S.W.3d 88, 92 (Mo. App. 2018). "Where two statutes concerning the same subject matter, when read individually, are unambiguous, but conflict when read together, this court will attempt to reconcile them and give effect to both." *Higgins*, 167 S.W.3d at 282. "The legislature is presumed to have acted with a full awareness and complete knowledge of the present state of the law, including judicial and legislative precedent." *Kolar v. First Student, Inc.*, 470 S.W.3d 770, 777 (Mo. App. 2015) (citing *Hogan v. Bd. Of Police Comm'rs of Kan. City*, 337 S.W.3d 124, 130 (Mo. App. 2011)).

The provisions of § 355.045 in place in 1960 describe what a nonprofit corporation's articles of incorporation were required to set forth. The statute requires, in relevant part, that the articles of incorporation set forth the corporation's name, the purpose for which it was organized, its period of duration, the identity of the incorporators, the make-up of the first board of directors, and any "provisions, not inconsistent with law, which the incorporators may choose to insert for the regulation of the internal affairs of the corporation, including any provision for distribution of assets on dissolution or final liquidation." Mo. Rev. Stat. § 355.045 (1959). The circuit court seized on this provision when it held that even though the statute did not expressly authorize third-party consent clauses, the clause was nonetheless permitted as an additional provision not inconsistent with law. The circuit court also held that the statute provided minimum requirements for nonprofit articles of incorporation, and that if more stringent requirements for amending the articles were desired, they were permissible.

In arguing that the consent clause is inconsistent with law, the Home relied on § 355.070 (1959), which it contends provides an exclusive list of means by which a corporation may amend its articles. After setting forth the procedures for amending articles where a corporation has

members, § 355.070 states "[w]here there are no members having voting rights an amendment shall be adopted at a meeting of the board of directors upon receiving the vote of a majority of the directors in office." The Home argues that this is the only acceptable method by which a Chapter 355 corporation can amend its articles, and because § 355.070 makes no mention of third-party consent clauses, any article provisions authorizing the same are inconsistent with the law. The Home further argues that the legislature could not possibly have intended that a third party – who already has the power to appoint and remove board members and receive property upon the Home's dissolution – could also have the power to approve or reject article amendments. Such an arrangement, the Home suggests, would amount to a nonprofit being effectively owned by that third party.

In isolation, § 355.070 could be plainly read as providing the exclusive procedures by which articles could be amended because of its use of the word "shall," a word commonly used in statutes to indicate that something is mandatory. *See Shall*, Black's Law Dictionary (10th Ed. 2014). And yet the word "shall" was not always so rigidly construed. In the fourth edition of Black's Law Dictionary - the edition in publication when the statutory provisions at issue were enacted - the word is first defined as "generally imperative or mandatory" when used in "statutes, contracts, or the like." But the definition goes further, explaining "shall" thusly:

> [It] may be construed as merely permissive or directory, (as equivalent to "may,") to carry out the legislative intention and in cases where no right or benefit to any one depends on its being taken in the imperative sense, and where no public or private right is impaired by its interpretation in the other sense.

*Shall*, Black's Law Dictionary (4th Ed. 1951). Indeed, this particular construction of "shall" was used by Missouri courts at the time with language strikingly similar to that used by Black's. For example, our Supreme Court explained in *State ex rel. Carpenter v. St. Louis* that the "word 'shall' when used in a statute, is often construed to mean 'may.' It is imperative where the

24

public or persons have rights which ought to be exercised or enforced.  But where no right or benefit depends up its imperative use, it may be held directory only."  2 S.W.2d 713, 727 (Mo. 1928).  The Eastern District explained that "shall" is "held to be permissive and not mandatory when necessary to sustain or accomplish the purpose of a legislative act."  *State ex. rel. Hanlon v. Maplewood*, 99 S.W.2d 138, 142 (Mo. App. 1936).

When viewing Chapter 355 in its entirety, it is difficult to accept that "shall" was intended to be construed as strictly mandatory.  There is every indication that the legislature intended to give incorporators considerable flexibility in structuring their organizations.  For example, board vacancies could be filled by the board itself or through other, unspecified means set forth in the articles of incorporation or bylaws; a quorum for the board could be defined by the articles or bylaws so long as it was at least "one-third of the whole board"; and a quorum of members could also be defined by the bylaws.  *See* §§ 355.140, 355.150. and 355.125, respectively.  This not only shows that considerable flexibility in corporate governance was contemplated and allowed, but that the statute was intended in large part to provide minimum standards for corporate governance, or default rules,[7] that incorporators could either adopt wholesale or expand upon where needed.

In viewing Chapter 355 as largely providing minimum standards for corporate governance which could then be expanded upon, "shall," as used in § 355.070, is imperative to the extent it provides minimum standards which must be adhered to by all nonprofit corporations seeking to amend their articles.  This protects the rights of members and incorporators to ensure

---

[7]    In construing a more current provision of Chapter 355, our Eastern District colleagues explained "default rules" as "providing a default standard for the parties *unless* by-laws [or article provisions] have been adopted which provide otherwise."  *Mannering Condo. Ass'n v. Schulte*, 462 S.W.3d 830, 835 (Mo. App. 2015).

that their organizations are responsibly run as originally intended, and the public is assured that legal entities, which possess various rights under the law, are not easily corrupted or commandeered through ill-advised changes to their articles. At the same time, "shall" is permissive or directory to the extent incorporators are adding additional safeguards to the amendment process which go above and beyond the law's baseline requirements. Member rights and the public interest are no longer at issue, so "shall" becomes permissive allowing incorporators to increase amendment requirements as they see fit.

Also, if we construed § 355.070 as strictly as the Home urges, it would void other article provisions pertaining to the amendment process. For example, provisions requiring a super-majority of the board to approve article amendments or provisions mandating unanimous approval for amendments would be void under the Home's suggested construction of the statute. Surely this is not what the legislature intended.

We also find that not only are third party consent clauses not in conflict with the public policy considerations contemplated by the legislature, they actually support them. First, § 355.045 allows for provisions which provide "for distribution of assets on dissolution or final liquidation." As this very case illustrates, third-party consent clauses allow for parties who have property rights under such provisions to ensure that their rights will not be extinguished without their approval. Furthermore, § 355.025 sets forth the various purposes for which corporations may be organized under the chapter including religious and social welfare purposes and "for the purpose of executing any trust or administering any community chest, fund, or foundation." Did the legislature intend to deny settlors, trustees, foundations, and other benefactors the use of special safeguards to ensure that the non-profits they created and endowed with substantial assets could not be commandeered and stolen away by rogue board members? The Home might wish

26

that it were so, but we are firmly convinced that such a result is decidedly not what the legislature had in mind when it passed this law.

Therefore, we hold that § 355.070 provided minimum standards for the amendment of corporate articles, that additional safeguards or requirements for the amendment process were allowed, and that the third-party consent clause in the Home's articles was allowed as an additional provision, not inconsistent with law, pursuant to § 355.045. Because we hold that third-party consent clauses were legal in 1959, the Home's argument that the 1994 changes in the law were not retroactive is moot. As to the Home's contention that the articles were not in compliance with § 355.606 (1994) because they did not specify that any approval or rejection of a proposed amendment be made in writing, this flies in the face of well-settled principles of corporate law. Namely, that "[a]pplicable state laws are embodied in the charter of a corporation." *Gaddy v. Phelps County Bank*, 20 S.W.3d 511, 514 (Mo. banc 2000) (citation omitted); *see also Pacific Intermountain Exp. Co. v. Best Truck Lines, Inc.*, 518 S.W.2d 469, 472 (Mo. App. 1974) (holding that statutory requirements that a corporation file necessary annual paperwork and pay applicable fees are read into corporate articles, rendering them legal). The Home's Point II is denied.

### Point III

In its third and final point on appeal, the Home argues that the circuit court erred by denying the Home's motion to amend, correct, or modify the judgment in respect to two findings of fact. First, the circuit court found that the Convention disapproved of the Home's 2000 Amendments in writing. The Home claims that this was an error, and that the Convention's disapproval of the 2000 Amendments was only reflected in the Convention's internal minutes. However, the Home concedes in its brief that the Convention did subsequently request that the Home rescind its new

27

articles. App. Brief at 53 n. 3.

Second, the Home claims that the circuit court erred in finding that the Home lacked the authority to form the Missouri Baptist Home Foundation, Inc. The Home argues that no provision in any version of its articles restricted its right to form new legal entities.

We note that Article VI of the Home's articles in effect prior to the 2000 Amendments, quoted *supra*, restricts the Home's ability to alienate or encumber property, and it further states that if the Home "shall cease to operate…for the purposes and objects as set out herein all of the assets of the corporation shall be disposed of by the Trustees of [the] corporation as directed by [the Convention] and shall be construed to be the property of [the Convention.]" We further note that the Home transferred assets to the newly created foundation. Without engaging in a protracted analysis of the Home's articles, it is clear that the Convention had some enforceable rights regarding how the Home's property was used or disposed of.

Therefore, at the minimum, even if the creation of the foundation was permissible under the Home's articles, the transfer of assets to the foundation likely was not. In any event, whether the circuit court's findings were slightly inaccurate in the hyper-technical manner suggested by the Home is of no relevance to the propriety of summary judgment. "Only genuine disputes as to material facts preclude summary judgment. A material fact in the context of summary judgment is one from which the right to judgment flows. *Goerlitz v. City of Maryville*, 333 S.W.3d 450, 453 (Mo. banc 2011) (citations omitted). Nothing argued here by the Home, even if true, has any bearing whatsoever on the Convention's right to summary judgment. The Home's Point III is denied.

## Conclusion

The circuit court's grant of summary judgment is affirmed.

28

_____

Anthony Rex Gabbert, Judge

All concur.